[Cite as *Rosenshine v. Med. College Hosps.*, 2011-Ohio-1435.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us


DAWN ROSENSHINE, Exec.

Plaintiff

v.

MEDICAL COLLEGE HOSPITALS

Defendant
Case No. 1998-04701

Judge Joseph T. Clark

DECISION


**{¶ 1}** Plaintiff filed this action in 1998 alleging wrongful death and survivorship claims based upon medical treatment provided to plaintiff's decedent in 1995 at Medical College Hospitals (MCO).[1] The issues of liability and damages were bifurcated and the case was submitted to the court for a decision on the merits based upon briefs and supporting exhibits, including medical records, depositions, and affidavits of plaintiff's next of kin.[2]

---

[1] This case has had a lengthy procedural history. Proceedings were first delayed as a result of the liquidation of P.I.E. Insurance Co., the insurance carrier of several defendants in a connected action. See *Rosenshine v Associated Physicians of the Medical College of Ohio, Inc.*, Lucas C.P. No.CI200803434. This case was delayed for an additional four years pending decision by the Supreme Court of Ohio in *Johns v. Univ. of Cincinnati Med. Assoc.*, 101 Ohio St.3d 234, 2004-Ohio-824. See also *Theobald v. Univ. of Cincinnati*, 101 Ohio St.3d 370, 2004-Ohio-1527; and *Gerschutz v. Med. College of Ohio Hosp.*, Franklin App. Nos. 04AP-794 and 04AP-796, 2005-Ohio-1158.

[2] On March 2, 2010, the court ruled that Dr. Steele's testimony "shall be permitted at trial by way of the previously filed deposition, or live testimony if it is limited to the opinions expressed in his deposition."

**{¶ 2}** On May 30, 1995, plaintiff's decedent, Theresa Dougherty, was admitted to defendant hospital for a cardiac catheterization. Dougherty had been referred to the clinic by her internists, Drs. Gard and Federman.[3] Dr. Blair Grubb was the attending physician for the cardiology services group on that date and, as such, he was listed on the admission form. Dr. Grubb did not perform the catheterization or otherwise participate in Dougherty's medical care. Dr. William Walston, a resident then on rotation in the cardiology group wrote admitting orders for Dougherty at the direction of Dr. Michael Lorton, a cardiology fellow. There is no dispute that one of the admitting orders directed that a chest x-ray be performed; however, the original order form is not in evidence. According to Dr. Walston, the x-ray was ordered to "rule out" a myocardial infarction. The x-ray was taken and a report was prepared by Dr. Lee Woldenberg who noted a "right upper lung mass, measuring 2.5 centimeters." Dr. Woldenberg's report was available to the physicians performing the catheterization. Furthermore, according to hospital policies in effect at the time, positive findings such as a lung mass were to be reported to appropriate personnel. (Policy No. R-014, Steele Deposition, Exhibit 3, Page 8.)

**{¶ 3}** Dr. Woldenberg testified in his deposition that he did not have any independent recollection whether he contacted Dr. Walston, Dr. Grubb, or anyone connected with Dougherty's treatment. His verified x-ray report does not contain a notation that he had contacted any physician regarding the finding in Dougherty's x-ray. Dr. Woldenberg, however, stated in his deposition that it was his custom to contact either the requesting physician or the nurses' station on the patient's floor under such circumstances. In addition to contacting the requesting physician, Dr. Woldenberg asserted that a copy of the x-ray report would be printed for the patient's chart, one copy would be printed for the requesting physician, and one copy would be printed for the attending physician.

**{¶ 4}** According to Roberta Miller, the Administrative Director of the Department of Radiology, after an x-ray report has been verified, the x-ray report is then printed and four "batches" are distributed as follows: to the patient's chart; to the radiology

---

[3]Dougherty was seen only by Dr. Federman prior to admission at MCO as Dr. Gard was unavailable.

department file room; to the requesting physician, attending physician and any "interested physicians"; and to billing. Miller also stated that, when her department is sorting the copies to be distributed from the physician's batch, resident copies are not sent to the residents but are instead sent to a teaching file to be used for academic purposes.

{¶ 5} On May 31, 1995, Dr. Walston left the cardiology service and rotated into a family practice residency; he contends that he never saw the x-ray report until after this action was filed. There is a notation in the report which shows it was transcribed at 23:20 on May 31, 1995. The report also contains a notation that it was verified by Dr. Woldenberg at 9:55 a.m., on June 1, 1995, at which point the report would have become available for distribution outside the radiology department.

{¶ 6} Dougherty was discharged on June 2, 1995. A discharge summary was prepared on that date by Dr. Banerjee, a successor resident to Dr. Walston. Dr. Grubb signed the discharge summary on June 12, 1995. The discharge summary does not refer to the positive x-ray finding. Dr. Johnson, Dr. Walston's residency supervisor and faculty advisor, testified in his deposition that a resident should make a note of unexpected abnormal findings, such as those found in Dougherty's chest x-ray, when completing a discharge summary. Dr. Grubb also signed an "Attestation Statement" on June 6, 1995, that refers to a "chest swelling/mass/lump" as one of Dougherty's diagnoses. Dr. Grubb had no knowledge of the type of chest mass or lump described in the Attestation Statement nor did he make any attempt to find out.

{¶ 7} Plaintiff alleges that, because MCO staff failed to inform Dougherty of the lung mass detected in the May 30, 1995 x-ray, the mass grew to inoperable proportions by the time Dougherty returned to MCO in November 1996. Dougherty died of lung cancer on November 3, 1997.

{¶ 8} The primary issue for the court is whether Drs. Walston, Banerjee, and Lorton deviated from the standard of care with respect to Dougherty's May 30, 1995 hospital admission either by failing to observe hospital policies and procedures for the handling of x-ray results or by failing otherwise to diagnose plaintiff's lung cancer.

{¶ 9} In order to prevail on a claim of medical malpractice or professional negligence, plaintiff must first prove: 1) the standard of care recognized by the medical

community; 2) the failure of defendant to meet the requisite standard of care; and 3) a direct causal connection between the medically negligent act and the injury sustained. *Wheeler v. Wise* (1999), 133 Ohio App.3d 564; *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127. The appropriate standard of care must be proven by expert testimony. *Bruni*, supra, at 130. That expert testimony must explain what a medical professional of ordinary skill, care, and diligence in the same medical specialty would do in similar circumstances. Id.

{¶ 10} With regard to the standard of care, plaintiff presented the deposition testimony of Dr. Steele.

{¶ 11} "Q:   What is the standard required with respect to ordering of an x-ray and following up on results?

{¶ 12} "A:   If you order it, you have to find out what it showed; or if you are supervising someone who ordered it, you have to find out what it showed.

{¶ 13} "Q:   Okay.

{¶ 14} "A:   If you are responsible for the patient's admission, you have to know what it showed."  (Steele Deposition, Pages 40-41.)

{¶ 15} Dr. Steele also explained the standard of care for residents.

{¶ 16} "Q:   I just have a hypothetical question for you: If a resident requested the chest x-ray, would you expect the resident, within the standard of care, to follow up on the result or not?

{¶ 17} "A:   Well, again, not necessarily.  That's the thing you run into with teaching hospitals.  Maybe it's Friday night.  Maybe he was on call Saturday night.  Maybe he was on call that night and wasn't on call the next day.  So that's why the attending is the overall person in charge.

{¶ 18} "Q:   Okay.

{¶ 19} "A:   Maybe they rotated the 1st of the month, too, or the 3rd or whatever." (Steele Deposition, Page 73.)

{¶ 20} In addition to Dr. Steele, Dr. Johnson also commented on the standard of care required when ordering tests.

{¶ 21} "Q:   When training family practice residents like Dr. Walston, do you give them any instruction with respect to ordering tests and following up on the

results? * * * [I]n general, do you instruct residents from a family practice setting with respect to following up on tests for which they have written the orders?

**{¶ 22}** "A: Yes. It's inherent being a doctor to follow up on abnormal tests.

**{¶ 23}** "Q: Do you instruct residents that if they order a test, they should follow up to determine whether or not the result is abnormal?

**{¶ 24}** "A: Yes." (Johnson Deposition, Pages 45-47.)

**{¶ 25}** "Q: So if the resident ordered a study, it would be their responsibility to follow up on that and determine what the results were, correct?

**{¶ 26}** "A: Yes.

**{¶ 27}** "Q: And that would be regardless of whether the resident is on that service or leaving that service, it would be the responsibility of the resident to either insure that they look at that study that's been ordered, or instruct the oncoming resident or new oncoming resident to follow up on that study, correct?

**{¶ 28}** "A: Yes." (Johnson Deposition, Page 56.)

**{¶ 29}** Dr. Grubb, the attending physician, opined on the standard of care as follows:

**{¶ 30}** "Q: Would you agree that it would be standard medical practice for the ordering physician to determine or at least be made aware of the results of a test or study that he ordered?

**{¶ 31}** "A: Yes.

**{¶ 32}** "Q: Would you agree that if that physician is leaving the service or transferring that patient to another physician's care, be it another resident, be it another physician, he is going off call, if you will, to make that incoming doctor aware that the study had been ordered and [to] follow up on the results of that study?

**{¶ 33}** "A: Yes.

**{¶ 34}** "Q: Would you agree that it is standard medical practice for the ordering physician to make sure the study that he had ordered is completed and made aware * * * of the results of that study? If you are going to order a study you want to find out what came from it?

**{¶ 35}** "A: Yeah." (Grubb Deposition, Pages 44-45.)

**{¶ 36}** "Q:   Also in response to Mr. Bodie's questions concerning what would be the standard practice of medicine, I believe I understood your testimony to be that it would be standard practice for a physician requesting a study such as radiology films, as we see in Exhibit 4, to follow up on that to see what the results of that study were; did I understand your testimony?

**{¶ 37}** "A:   Yes.

**{¶ 38}** "Q:   And that's an obligation that would be incumbent upon the physician who is requesting the study, correct?

**{¶ 39}** "A:   Yes.

**{¶ 40}** "Q:   Does that obligation change in any respect if the requesting physician is a resident?

**{¶ 41}** "A:   No.

**{¶ 42}** "Q:   Does that obligation change if the resident is going off call between the time he orders the x-ray and when the x-ray report is finished?

**{¶ 43}** "A:   The incoming resident assumes the responsibility of the outgoing resident.

**{¶ 44}** "Q:   Is there a custom, practice or procedure to make sure that the outgoing and incoming resident communicate?

**{¶ 45}** "A:   They should sign, verbally sign out to each other.

**{¶ 46}** "Q:   And by verbally sign out, what does that mean?

**{¶ 47}** "A:   To speak to the incoming person concerning people under their care.

**{¶ 48}** "Q:   And that verbal discussion would include informing the outgoing resident and informing the incoming resident that, for instance, I ordered two chest x-rays for this patient, please follow up to see what the results are?

**{¶ 49}** "A:   Yes."  (Grubb Deposition, Pages 48-50.)

**{¶ 50}** With regard to the standard of care, defendant's expert, Dr. Kahn opined as follows:

**{¶ 51}** "Q:   Doctor, does a physician who orders an x-ray of a patient have an obligation under the standard of care to follow up on that x-ray and determine what the results of the x-ray are?

**{¶ 52}** "A: Either to do that or to designate an appropriate person to do that, or to indicate it's pending at discharge and needs to be followed up at outpatient setting, but some mechanism like that, yes.

**{¶ 53}** "Q: Okay. And if that is not done in a specific case, is that a violation of the extent of standard of medical care?

**{¶ 54}** "A: I think that's something that I'm comfortable indicating, yes." (Kahn Deposition, Pages 48-49.)

**{¶ 55}** Based upon the foregoing expert testimony, the court finds that the standard of care in the medical community requires a physician who orders a chest x-ray of a patient under his care to follow up on the order both to assure that the x-ray is performed and to obtain the results. The standard further requires such physician to inform the patient of any abnormal findings and to advise the patient accordingly.

**{¶ 56}** The standard of care is no different for resident physicians even though such residents rotate from one service to another before the particular test is performed and the results are known. Indeed, it is the duty of the ordering physician to either personally follow up on the test or to personally inform the resident assuming his duties of the specific test ordered and the need to obtain and review the results.

**{¶ 57}** In this case, Dr. Walston did not meet the standard of care in that he both failed to follow up on the chest x-ray that he had ordered and failed to communicate the need for a follow-up to Dr. Banerjee when he turned Dougherty's care over to him.

**{¶ 58}** With respect to Dr. Banerjee, the standard of care required him to obtain results of tests that had been ordered on a patient under his care and to communicate the results to the patient. According to the expert testimony, Dr. Banerjee was not relieved of that duty simply because Dr. Walston failed to personally inform him that the test had been ordered.

**{¶ 59}** Based upon the totality of the evidence, the court finds that the treatment rendered to Dougherty by Drs. Walston and Banerjee fell below the accepted standard of care in the medical profession inasmuch as neither physician informed Dougherty of the results of the chest x-ray prior to her discharge. Similarly, inasmuch as Dr. Lorton was the physician charged with the supervision of both Drs. Walston and Banerjee, his failure to instruct such residents of the need to follow up on tests ordered for their

patients was also a breach of the standard of care. As a result of these failures, Dougherty did not get proper medical attention for her condition in a timely manner. Thus, MCO may be held liable to plaintiff for the failure of its employees under the theory of respondeat superior.

{¶ 60} Plaintiff also argues that MCO itself was negligent inasmuch as it relied upon residents to follow up on the results of routine testing and that it employed the use of a fellow, Dr. Lorton, to supervise the residents. In support of this argument, plaintiff presented the deposition testimony of Dr. Steele who stated that he believed it was not within the standard of care to rely upon fellows to supervise residents. However, after reviewing the hospital policies, Dr. Steele agreed that the policies were reasonable and appropriate and placed the responsibility of reporting unexpected findings on Dr. Woldenberg. Based upon the evidence, the court finds that plaintiff has failed to prove administrative negligence on the part of MCO. However, as noted above, MCO may be liable to plaintiff for the negligence of Drs. Banerjee, Walston and Lorton under the theory of respondeat superior.

{¶ 61} Turning to the issue of proximate cause, defendant first contends that the actions  or omissions of Drs. Woldenberg and Grubb constitute an intervening and superseding  cause of Dougherty's injury. Restatement of the Law 2d, Torts (1965), Section 440 defines a superseding cause as "an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." "Whether an intervening act breaks the causal connection between the negligence and the injury, thus relieving one of liability for his negligence, depends upon whether that intervening actor was a conscious and responsible agency which could or should have eliminated the hazard, and whether the intervening cause was reasonably foreseeable by the one who was guilty of the negligence." *Cascone v. Herb Kay Co.* (1983), 6 Ohio St.3d 155, 159. (Citations omitted.)

{¶ 62} In relevant hospital policy in effect at the time states that "[w]hen an unexpected positive (non-life threatening) radiological finding is seen:  '[T]he radiologist will call the requesting physician or if the patient is admitted may call the patient's RN or

the unit charge RN * * *.  The radiologist will also dictate this in the report.'" (Policy No. R-014, Steele Deposition, Exhibit 3, Page 8.)

**{¶ 63}** Dr. Steele testified in his deposition that teaching-hospitals become fragmented and that, as a result, the attending physician, Dr. Grubb, is required to "put it all together."  (Steele Deposition, Page 44.)  With respect to the discharge summary, Dr. Steele stated that "[o]ne of the responsibilities to sign the discharge summary is to review everything in the chart and see that it all got addressed.  That's the critical function."  Id. 42-43.  Dr. Grubb admitted signing both the attestation statement and the discharge summary but had no specific recollection of looking at Dougherty's medical chart prior to signing the two documents.  Dr. Grubb also denied receiving a copy of the x-ray report.

**{¶ 64}** Based upon the testimony, it is clear to the court that both Drs. Woldenberg and Grubb failed to meet the standard of care owed to plaintiff with respect to Dougherty.  The court also finds that, more likely than not, had either Dr. Woldenberg or Dr. Grubb performed in accordance with the recognized standard of care, Dougherty's cancer would have been properly diagnosed before she was discharged.  Thus, the evidence establishes that both Drs. Woldenberg and Grubb were conscious and reasonable intervening actors.

**{¶ 65}** However, given the fact that the standard of care for each of the medical professionals who treated Dougherty in this case is virtually the same (assure that the ordered test is performed, obtain the results and communicate those results either to the patient or other medical professional directly involved with the patient's care), the court finds that the respective negligence of Drs. Woldenberg and Grubb was reasonably foreseeable as to Drs. Walston, Banerjee and Lorton.

**{¶ 66}** Indeed, if it were not foreseeable that a radiologist might inadvertently fail to communicate positive findings to the treating physician, the standard of care would not require that the treating physician follow up on the test and seek out the results.  Similarly, it is reasonably foreseeable that an attending physician, in authorizing a patient's discharge, might rely on the resident's erroneous discharge summary in making the decision to sign off on the discharge.  Although such reliance by an attending physician would violate the standard of care, the evidence in this case

convinces the court that such an error is reasonably foreseeable. In short, the intervening negligence of Drs. Woldenberg and Grubb was not a superseding cause of the harm such that Dr. Walston, Banerjee, and Lorton should be relieved of any liability to plaintiff.

{¶ 67} Defendant next contends that the failure to diagnose Dougherty's cancer prior to her discharge in 1995 was not the proximate cause of Dougherty's death inasmuch as her cancer had already progressed to the point where immediate aggressive treatment would not have saved her life.

{¶ 68} In a medical malpractice action premised on a failure to properly diagnose or treat a medical condition that results in a patient's death, the proper standard of proof on the issue of causation is whether with proper diagnosis and treatment the patient probably would have survived. "'Probably' is defined as 'more likely than not' or a greater than fifty percent chance." *Miller v. Paulson* (1994), 97 Ohio App.3d 217, 222, quoting *Cooper v. Sisters of Charity of Cincinnati, Inc. (*1971), 27 Ohio St.2d 242.

{¶ 69} On the issue of causation, Dr. Steele testified to a reasonable degree of medical probability that plaintiff had at least a 70 percent chance of cure had the mass been diagnosed and removed in June 1995.[4] Dr. Steele based his opinion on his belief that plaintiff would have become symptomatic sooner had the cancer progressed to the stage where Dougherty's "nodes been positive," although he was unable to opine as to how much sooner that would have been.

{¶ 70} Dr. Steele testified that the symptoms he would expect to see in a patient with advanced lung cancer would include cough, dyspnea, weight loss, chest pain, hemoptysis, and weakness. However, Dr. Steele also admitted that a cough has more to do with where the cancer is located in the patient's body than the stage of advancement. He also admitted that weight loss is a very poor prognostic sign and that chest pain would not reveal anything in particular about the advancement of cancer. Dr. Steele acknowledged that blood in a patient's cough is not very reliable in terms of staging. Indeed, Dr. Steele testified that he did not believe that he could draw any

---

[4]Because plaintiff relies upon the discovery deposition of Dr. Steele filed December 8, 2003, Dr. Steele's testimony was presented by way of cross-examination only.

"scientifically meaningful conclusions from how long someone had symptoms and then try to compare that to the stage of the disease." (Steele Deposition, Page 107.)

{¶ 71} Moreover, Dr. Steele acknowledged that a note written by Dr. Olson in November 1996 documents Dougherty's current complaints of sternal pain, hemoptysis, malaise and a six-to-eight-month history of blood-streaked sputum.

{¶ 72} Dr. Steele also assumed, in expressing his opinion, both that the nodes were negative and that there was no metastatic disease. However, Dr. Steele acknowledged that in June 1995, Dougherty had a mass in her right lung and a small "something" in her left lung that was cancerous in November 1996. He also admitted that due to the lack of diagnostic testing, he had no reliable measure to determine whether, in 1995, Dougherty's nodes were negative or whether there was metastatic disease.

{¶ 73} Defendant's expert, Dr. Lerner, testified that the delay in diagnosis from June 1995 to November 1996 did not affect Dougherty's "outcome," meaning what was going to happen as far as survival or death. According to Dr. Lerner, the fact that Dougherty eventually developed lesions in her left lung and in her brain is evidence that her cancer had metastasized in 1995. However, he was unwilling to say with a reasonable degree of medical certainty that Dougherty's cancer had metastasized by May 1995.

{¶ 74} To establish a claim of medical malpractice, plaintiff "must show the existence of a standard of care within the medical community, breach of that standard of care by the defendant, and proximate cause between the medical negligence and the injury sustained." *Taylor v. McCullough-Hyde Memorial Hospital* (1996), 116 Ohio App.3d 595, 599, citing *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 131-132. A medical negligence claim requires the plaintiff to "prove causation through medical expert testimony in terms of probability to establish that the injury was, more likely than not, caused by the defendant's negligence." *Roberts v. Ohio Permanente Med. Group, Inc.*, 76 Ohio St. 3d 483, 485, 1996-Ohio-375.

{¶ 75} Although the experts agree that the proper treatment in May 1995 would have been a surgical procedure to remove the 2.5 centimeter mass in Dougherty's right lung, plaintiff did not present sufficient evidence to prove to the court that an earlier

diagnosis and surgical intervention in May 1995 would have saved Dougherty's life. Inasmuch as plaintiff bears the burden of proof on the critical element of causation, the court finds that plaintiff has failed to establish, by the preponderance of the evidence, that defendant's negligence was a proximate cause of Dougherty's harm. Specifically, plaintiff has not persuaded the court that defendant's failure to diagnose the 2.5 centimeter mass in Dougherty's lung was the proximate cause of her death. Accordingly, judgment shall be rendered in favor of defendant.

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

DAWN ROSENSHINE, Exec.

    Plaintiff

    v.

MEDICAL COLLEGE HOSPITALS

    Defendant
    Case No. 1998-04701

Judge Joseph T. Clark

JUDGMENT ENTRY

The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court

costs are assessed against plaintiff.  The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
JOSEPH T. CLARK
Judge

cc:

Anne B. Strait
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Mark F. Vitou
111 West Dudley
Maumee, Ohio 43537-2140

LP/GWP/cmd
Filed March 15, 2011
To S.C. reporter March 22, 2011